## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MATTHEW ALAN KURILIK,

                    Petitioner,                        Case No. 05-74317
                                                            Honorable Marianne O. Battani

v.

HUGH WOLFENBARGER,

                    Respondent.

_____/

## OPINION AND ORDER DENYING PETITIONER'S
## PETITION FOR WRIT OF HABEAS CORPUS

### I. Introduction

       Before the Court is Matthew Alan Kurilik's ("Petitioner") petition for a writ of habeas

corpus, filed on March 10, 2005.  (Docket # 1.)  Petitioner, a state inmate, currently confined at

the Kinross Correctional Facility in Kincheloe, Michigan, seeks the issuance of a writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  In 1998, Petitioner was convicted and sentenced in

Oakland County, Michigan, Circuit Court, on (1) the lesser-included offense of involuntary

manslaughter with a motor vehicle, MICH.COMP.LAWS § 750.321, and (2) operating under the

influence of liquor (OUIL) causing death, MICH.COMP.LAWS § 257.625(4).  His convictions and

sentences were affirmed on direct appeal and collateral review in state court.  In his petition for

writ of habeas corpus, Petitioner raises five grounds for relief, arguing that (1) he was subjected

to double jeopardy when he was prosecuted for second-degree murder and operating under the

influence of liquor causing death; (2) he did not knowingly and intelligently waive his Miranda[1]

rights before speaking with the police; (3) his state trial counsel was ineffective for unreasonably

---

[1]  Miranda v. Arizona, 384 U.S. 436 (1966).

conceding to his guilt to the judge and the jury; (4) his state appellate counsel was ineffective; and (5) the state trial court abused its discretion in denying his motion for a directed verdict. Because this Court concludes that none of these grounds has merit, the Court denies Petitioner's petition for the writ of habeas corpus.

## II. Background

### A. Substantive Facts

This case arises from an automobile accident which occurred on July 7, 1998. Petitioner was arrested and charged with driving while intoxicated and causing severe injury/death to Jennifer Colling ("Ms. Colling" or "the deceased"). Ms. Colling died on July 12, 1998. Petitioner was charged in a six-count complaint after her death. The counts are as follows: (1) second-degree murder, MICH. COMP. LAWS § 750.317, (2) operating under the influence causing death, MICH. COMP. LAWS § 257.625(4), (3) operating under the influence causing injury (OUIL), MICH. COMP. LAWS § 257.625(5), (4) felon in possession, MICH. COMP. LAWS § 750.224(f), (5) driving while license suspended, MICH. COMP. LAWS § 257.904(1)(b), and (6) open alcohol in a vehicle, MICH. COMP. LAWS § 257.624(a).

On the first day of trial, which was held on February 22, 1999, Petitioner pleaded guilty to counts three through six. After Petitioner's guilty plea, a jury was selected, and the trial began with Ernest Colling, the deceased's father, testifying first.

Mr. Colling testified that, on the night in question, his daughter went to a concert at Pine Knob in Clarkston, Michigan, with a friend. According to his testimony, she was expected home around 11:30 p.m. Rather, the family received a phone call from a police officer from the Auburn Hills Police Department, informing him, and his family, that his daughter had been in an automobile accident and was in the hospital. Mr. Colling testified to the severity of his

daughter's injuries; he said that the doctors told them that his daughter had sustained a major bruise across her body, that she had as many as twelve broken ribs, along with severe contusions to her heart and lungs. After Mr. Colling's testimony, he was excused from the courtroom.

Several eyewitnesses to the accident then testified. Jeffrey Hanley testified that, as he was driving northbound on I-75 in the center lane, he observed, through his rear-view mirror, a set of headlights approaching him; he said that he then saw another vehicle pass him on the right and then return to the center lane. It was Mr. Hanley's testimony that there was a terrible rainstorm that night. When questioned about his speed, Mr. Hanley said that he was traveling at a speed of about sixty-five to sixty-eight miles per hour. It was his estimate that the speed of the car that passed him was traveling about ten to fifteen miles per hour faster. Mr. Hanley described the vehicle as a Chevy van.

According to Mr. Hanley's testimony, he witnessed the van going into the left lane; he said that he saw its taillights start to slide into the median. Mr. Hanley described the motion as abrupt. He said that the van then crossed the median, where it struck a Saturn, and then continued to travel north on the southbound lanes of I-75, eventually hitting a black Ford Tempo. Mr. Hanley testified that between the collision with the Saturn and the crash with the Tempo, he saw a body, from the van, flying through the air. The body was later identified as that of Petitioner's.

Mr. Hanley testified that he stopped, went and checked on Petitioner, and checked on the people in the Tempo. When he looked inside the Tempo, he saw two young girls, both conscious. When Mr. Hanley approached Petitioner, who was also conscious, he said that Petitioner asked him if he had hit anyone. Mr. Hanley said that he told Petitioner that he had hit two cars, to which Petitioner replied that he was not driving.

Gary Que was next to testify. He said that he was traveling northbound on I-75, when he saw a van swerve in front of him. Mr. Que said that the van looked like it was going to go off the shoulder but veered back onto the road before going across the median. Mr. Que estimated that the van was going about thirty miles per hour faster than he was, and described the weather conditions as wet and rainy.

Daniel Wolschleger, a police officer who was on his way home from work, testified that he was in the southbound lane of I-75, traveling at a speed of about fifty to sixty miles per hour, when a van "came out of nowhere" and hit a couple of cars, which, in turn, caused him to hit the car in front of him. He described the traffic on southbound I-75 as heavy, and that there was nowhere for him to go to avoid the collision.

Officer Wolschleger testified that he stopped to check on the cars that were hit by the van; he said that he also looked inside the van, but did not see anyone inside. He said that he saw Petitioner on the ground, not moving and curled up in a fetal-like position. Officer Wolschleger said that Petitioner jumped up and took a few steps. He testified that he then grabbed Petitioner so that he would not fall. It was Officer Wolschleger's testimony that he smelled a heavy odor of intoxicants on Petitioner's breath, and that Petitioner's eyes were bloodshot and watery. Officer Wolschleger testified that Petitioner told him that he had been drinking. Officer Wolschleger said that he stayed with Petitioner until the police and the emergency medical technicians arrived.

Brian McClain was another eyewitness, who testified, and who was also involved in the accident. He testified that he was on his way to work when his Saturn was hit by the van. The impact of the collision ripped off the roof of his car, smashing the windshield and the door. Mr. McClain said that he received some cuts and sustained a whiplash. He testified that he was

taken to the hospital, where he was treated and released that morning. Mr. McClain said that, before going to the hospital, he saw Petitioner standing by the van and saw beer bottles strewn about the ground.

Officer Jeffrey Walker testified that after he was dispatched to the scene of the accident, and after talking with another police officer and some of the witnesses, he approached Petitioner, smelling a strong odor of intoxicants coming from him. Officer Walker noticed that Petitioner's eyes were red and watery. He performed the nystagmus test on Petitioner, using an ink pen as the testing device.[2] Officer Walker testified that Petitioner's eyes were jerking during the test, which indicated to the officer that he (Petitioner) was intoxicated. Officer Walker said that Petitioner acknowledged that he was driving and that he had been drinking; Petitioner indicated to Officer Walker that he had a pint and one half of Jack Daniels. Officer Walker said that Petitioner was then transported to the hospital, where blood was drawn and a blood-alcohol test performed.[3]

Dr. John Ketner treated the deceased when she was admitted to the hospital. He described her condition as unstable; she had a rapid heart rate, difficulty breathing, and abdominal pain. A CAT scan was performed and revealed that she had suffered a ruptured liver. Dr. Ketner said that there was also concern that she had suffered a bruise to her heart, and that her lungs were badly damaged and her ribs fractured. He testified that the injury to her lungs prevented the lungs from providing the necessary oxygen to her blood and organs. Dr. Ketner

---

[2] The nystagmus test is performed by placing an object in front of a subject at an angle, where the subject follows the object with his or her head. The tester, the police officer in this case, then looks for an involuntary jerking of the eyes, which is consistent with someone who has been drinking or is intoxicated.

[3] The hospital blood test was .17 grams of alcohol per hundred millimeters of blood, and the forensic lab test was .16 grams of alcohol per hundred millimeters of blood.

said that over the course of five days, her condition deteriorated; she suffered a cardiac arrest, could not be revived, and subsequently died.

Dr. Bernardino Pacris was called to testify next. He performed the autopsy on the deceased, and testified that the cause of death was chest and abdominal trauma.

After Dr. Pacris's testimony, the jury was excused, and a Walker hearing was held on defense counsel's motion to suppress Petitioner's statement, which he made to Detective Craig Damiani, a detective with the City of Auburn Hills Police Department, who was investigating the incident. The motion was based on whether the statement was a violation of Miranda; whether Petitioner knowingly and intelligently made the statement to Detective Damiani when he was interviewed in the hospital. It was Petitioner's position that the statement was not made knowingly and intelligently, because he was not fully advised of the consequences of any of the statements that he made to the police officers. Petitioner said that he was told that he would be charged with OUIL causing injury and was not told that he could be charged with second-degree murder and OUIL causing death. Otherwise, it was Petitioner's position that he would have requested an attorney and remained silent.

During the Walker hearing, Detective Damiani testified that he conducted an interview of Petitioner, in the hospital, shortly after the accident. The interview took place at 4:50 a.m., only a few hours after the accident, and while Petitioner was lying in bed and on pain medication for the sutures he had received in his head that night. Detective Damiani said that he advised Petitioner of his Miranda rights, told him that he was investigating the accident, and that the findings would be turned over to the prosecutor's office. Detective Damiani also told Petitioner that he had been placed under arrest, but was being released pending the issuance of an arrest warrant. Detective Damiani told Petitioner that he was facing a possible DUI (driving under the

influence) charge or an OUIL causing serious injury charge.  Petitioner was informed of those charges, after the <u>Miranda</u> rights were read to him, and after he (Petitioner) consented to speak with the detective.  Petitioner did not request the presence of an attorney.  Rather, Petitioner agreed to waive his right against self-incrimination, by signing a waiver, and proceeded to answer Detective Damiani's questions.

During the course of that interview, Petitioner admitted to Detective Damiani that he was drinking prior to the accident.  He told him that he had been drinking because of problems that he had encountered with his girlfriend that evening; Petitioner also admitted that he was speeding that evening.  Detective Damiani said that he asked Petitioner some questions to make sure that he was oriented to time and place; he testified that Petitioner interrupted him and told him what had happened.  Detective Damiani testified that he had not made any promises to Petitioner.  The statement was taped.  A full interview was then set up with Petitioner for July 11, 1998.  However, prior to that interview, Petitioner called Detective Damiani and told him that he no longer wanted to talk to him.

After hearing Detective Damiani's testimony, the trial court questioned Petitioner.  The following colloquy took place at the <u>Walker</u> hearing between the trial court and Detective Damiani:

> THE COURT:  No, it's my turn.  You went there to Pontiac
> Osteopathic Hospital on July 8th at about 4:50 a.m.?
>
> THE WITNESS:  That's correct.
>
> THE COURT:  And you identified yourself, went to – excuse me,
> you went to the defendant's bed in the hospital, you identified yourself as
> a police officer; is that correct?
>
> THE WITNESS:  That is correct.
>
> THE COURT:  And you told him there you were to investigate

what?

THE WITNESS:  The accident.

THE COURT:  The accident.  Did you tell the defendant what he was charged with when you told him that you were investigating the accident?

THE WITNESS:  Not at that point.

THE COURT.  Thank you.  Then did you ask the defendant whether or not – strike that – did you ask him whether or not he would be willing to make a statement?

THE WITNESS:  Yes, I did.

THE COURT:  But before you asked him that, did you advise him of anything?

THE WITNESS:  I had advised him that he –

THE COURT:  Let's take the sequence.

THE WITNESS:  Okay.

THE COURT:  Let's just take the sequence.  It's July 8th, 4:50 in the morning, you go to Pontiac Osteopathic Hospital, you locate the defendant.  What's the first thing you did?

THE WITNESS:  I identified myself as Craig Damiani, a detective with Auburn Hills Police Department.  I show him my badge and ID.  I advised him that I was here to talk with him regarding the accident but that he had been placed under arrest earlier, but he had been released pending our case being taken to the Prosecutor's Office for their review.  At that time I told him that since I wanted to question him regarding the incident, I wanted to inform him of his Miranda rights.  I informed him of his Miranda rights, at which time he waived those rights and stated he would speak with me.
At that time, then he asked me, what am I being charged with, sir?  With the information that I had –

THE COURT:  Well, before or afer he waived his rights?

THE WITNESS:  That was after he waived his rights.

THE COURT:  So he already waived his rights, knowing that

you're questioning him about an automobile accident?

      THE WITNESS:  That's correct, sir.

      THE COURT:  Okay.  And then he asks you the question.  And what was the question again?

      THE WITNESS:  The question is, what am I being charged with, sir?  And I had advised him that at this point he was placed under arrest for OUIL, which is operating while under the influence of liquor, and that we were waiting for the conditions of the other victims in the accident to be known and there was a possibility that he could be charged with OUIL causing serious injury.  Because the information I had from the hospital at that time, I did not have that type of information that somebody was going to die.

      THE COURT:  And he made a statement?

      THE WITNESS:  And then he made a statement.

(Trial Tr. Vol. II, pp. 340-345.)  The trial court then ruled that Petitioner's statement was freely, intelligently and voluntarily made, and denied defense counsel's motion to suppress the statement.  The jury then returned to the courtroom and Detective Damiani continued with his testimony.

Photographs were shown to the jurors regarding the accident scene–close-ups of the vehicles involved, and the alcohol bottles–the beer and the bottle of Jack Daniels that were in Petitioner's van.  Detective Damiani testified that Petitioner told him that he had a pint of whiskey over a two-hour period, because he was having problems with his girlfriend.  Petitioner denied having any brake problems or mechanical problems with the van.  According to Detective Damiani's testimony, Petitioner told him that he had estimated his speed at about ninety miles per hour, but could not say with certainty what it was exactly.

Carol Jensen was the passenger in the car with the deceased, and testified next. According to her testimony, they were traveling with the flow of traffic in the middle lane, when

she saw Petitioner's van skid across the northbound lanes and into the median, and eventually into Ms. Colling's car.  Ms. Jensen said that the force of the impact caused the seatbelt to knock the breath out of her.  Ms. Jensen testified that she was taken to the hospital, where she had emergency surgery to remove her spleen.

After the prosecution rested its case, the defense moved for a directed verdict; the trial court denied that motion.  Petitioner then testified.

Petitioner testified that, on the evening in question, he discovered that his girlfriend, whom he had lived with for seven years was having an affair.  He said that after being made aware of the situation, he left his apartment and went straight to a party store and bought a pint of Jack Daniels.  He said that he was driving a Chevy van that he had purchased from his boss.  According to Petitioner's testimony, he had put new brakes on the van and had changed the tires.  Petitioner acknowledged that there was a family history of drinking, but denied having a problem himself.  He said the beer cans found in the back of his van were empties from a prior occasion that had not been returned.

According to Petitioner's testimony, after he had purchased the Jack Daniels, he went to his friend's house, where they both drank the alcohol.  After consuming the first pint, Petitioner testified that they both returned to the liquor store and purchased another pint of Jack Daniels, and then they returned to his friend's house.

Petitioner further testified that, after he had another drink with his friend, he decided to drive home before he drank too much and would then be unable to drive.  As he was driving on I-75, he remembered approaching another car's rear bumper a little too fast, and then said that he tried to go around the car, but lost control of the van.  Petitioner said that he did not remember anything else about the accident.  Petitioner admitted that he consumed alcohol that evening and

drove, that he was driving too fast, and that he was daydreaming about the events that had occurred earlier that evening with his girlfriend.

It was Petitioner's testimony that, when Detective Damiani interviewed him in the hospital, Detective Damiani never told him that he could be charged with operating under the influence causing death. Nor did Detective Damiani tell him that he could be charged with murder. Petitioner testified that when Detective Damiani questioned him, it was only four hours after the accident, and he was medicated because he had to have some sutures to close a gap in his head that he had received because of the accident.

Dr. Ryan McConnell, a physician at Pontiac Osteopathic Hospital, was called as a rebuttal witness. Dr. McConnell testified that when he examined Petitioner and took his history, Petitioner told him that he had two to four beers every other day, but that he had not had any the day of the accident.

The jury found Petitioner guilty of the lesser offense of manslaughter and OUIL causing death. The trial judge sentenced Petitioner as a third habitual offender to concurrent prison terms of (1) fifteen to thirty years each for the involuntary manslaughter conviction and the OUIL causing death conviction, (2) five to ten years for the OUIL causing serious injury conviction, (3) two to ten years for the possession of a firearm by a felon conviction, and (4) ninety (90) days each for the driving with a suspended license and open intoxicants convictions.

## B. Procedural History

Petitioner, through counsel, filed his claim of appeal to the Michigan Court of Appeals within the appropriate time, alleging the following:

I.      The trial court erred in denying [Petitioner's] motion to suppress prejudicial statements made to a detective because the waiver of his rights under <u>Miranda</u> was not made knowingly and intelligently and as a result was violative of his Fifth Amendment right against self-incrimination and his Fourth Amendment right to due process.

II.     The trial court abused its discretion in sentencing [Petitioner] as if he was guilty of second-degree murder when in fact the jury had acquitted him of that charge.

Petitioner also filed a *pro per* supplemental brief, raising the following claims:

III.    [Petitioner] was denied the effective assistance of trial counsel and appellate counsel in violation of the Sixth Amendment to the United States Constitution and Mich. Const. 1963, art. I, § 20, thereby requiring reversal of [Petitioner's] conviction and sentence and the restoration of [Petitioner's] appeal of right.

IV.     [Petitioner] was denied the effective assistance of trial counsel by counsel's failure to seek suppression of blood test results thereby depriving [Petitioner] of a fair trial and impartial trial as guaranteed by the United States and Michigan Constitutions.

V.      [Petitioner] was deprived of a fair and impartial trial by the introduction of "prior acts" evidence in violation of M.R.E. 404(b)(1)(2), thereby depriving [Petitioner] of his constitutional right to a fair trial under the United States and Michigan Constitutions.

VI.     [Petitioner] is entitled to a new trial as a result of the prosecutor's nonflagrant improper remarks during closing argument, although defense counsel failed to object to the improper remarks, and the trial court failed to *sua sponte* give prompt and adequate curative instructions to the jury.

VII.    [Petitioner] was subjected to double jeopardy in violation of the United States and Michigan Constitutions when he was prosecuted under M.C.L. 275.625(4)(5); M.S.A. 9.2325(4)(5); and, M.C.L. 257.904; M.S.A. 9.2604, thereby subjecting [Petitioner] to multiple convictions and multiple punishments for the same transaction.

On September 28, 2001, the Michigan Court of Appeals affirmed Petitioner's convictions. People v. Kurilik, No. 219150, 2001 WL 1152904 (Mich. App. 2001). Petitioner then filed a delayed application for leave to appeal to the Michigan Supreme Court, raising the same issues as raised in the Michigan Court of Appeals, as well as the following additional issue:

> I.      Whether [Petitioner] was denied his state and federal constitutional rights with respect to equal protection of law and selective prosecution, in violation of the U.S. Const. amend. XIV, sec. 1, the Mich. Const. 1963, art. 1, sec. 2, and in light of the Michigan Supreme Court's ruling in *People v. Goecke*, 457 Mich. 442, and whether there was sufficient evidence to support said charge against [Petitioner's] state and federal constitutional rights, Fifth and Fourteenth Amendments.

The Michigan Supreme Court denied leave on March 22, 2002. People v. Kurilik, 641 N.W.2d 861 (2002).

In January 2003 Petitioner filed a motion for relief from judgment pursuant to sub-chapter 6.500 of the Michigan Court Rules, raising the following claims:

> I.      [Petitioner] was denied his state and federal constitutional rights to the effective assistance of counsel and due process, U.S. Const. amend. VI and XIV, where defense counsel conceded [Petitioner's] guilt to the jury.

> II.      The trial court abused its discretion and reversibly erred in denying [Petitioner's] motion for a directed verdict of acquittal; thereby violating [Petitioner's] state and federal constitutional rights to due process and a fair trial. U.S. Const. amend. XIV.

> III.      [Petitioner] was denied the effective assistance of assigned appellate counsel on his appeal of right to the Michigan Court of Appeals, causing manifest injustice and violating his constitutional rights. U.S. Const. amends. V, VI, and XIV.

On December 16, 2003, the trial court denied Petitioner's motion for relief from judgment, and, on June 30, 2004, denied his motion for rehearing. People v. Kurilik, No. 98-

161152-FC (Oakland County Circuit Court, Dec. 16, 2003); People v. Kurilik, No. 98-161152-FC (Oakland County Circuit Court, June 30, 2004).

In August 2004, Petitioner filed a delayed application for leave to appeal from that decision in the Michigan Court of Appeals. The Michigan Court of Appeals denied the delayed application on April 7, 2005. People v. Kurilik, No. 257253 (Mich. App. 2005). Petitioner then filed a delayed application for leave to appeal from that decision in the Michigan Supreme Court. The Michigan Supreme Court denied leave on October 31, 2005. People v. Kurilik, 705 N.W.2d 124 (Mich. 2005). Petitioner filed the pending petition for writ of habeas corpus on November 10, 2005, challenging his convictions on the following grounds:

> I.      [Petitioner] was subjected to double jeopardy in violation of the United States and Michigan Constitutions when he was prosecuted under M.C.L. 275.625(4)(5), and M.C.L. 750.321(c), thereby subjecting him to multiple convictions and multiple punishments for the same transaction.
>
> II.     The trial court erred in denying [Petitioner's] motion to suppress prejudicial statements made to a detective because the waiver of his rights under Miranda was not made knowingly and intelligently and as a result was violative of his Fifth Amendment right against self incrimination and his Fourteenth Amendment right to due process.
>
> III.    [Petitioner] was denied his federal constitutional right to the effective assistance of counsel and due process, U.S. Const. amends. VI and XIV, at trial where defense counsel unreasonably conceded [Petitioner's] guilt to the judge and jury.
>
> IV.     [Petitioner] was denied the effective assistance of assigned appellate counsel on his appeal of right to the Michigan Court of Appeals, causing manifest injustice and violating his constitutional rights. U.S. Const. amends. V, VI, and XIV.
>
> V.      The trial court abused its discretion and reversibly erred in denying [Petitioner's] motion for a directed verdict of acquittal; thereby violating [Petitioner's] federal constitutional rights to due process and a fair trial. U.S. Const. amend. XIV.

## III.  Standard of Review

Petitioner's application was filed after April 24, 1996, and therefore his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (April 24, 1996).  See Lindh v. Murphy, 521 U.S. 320, 326-27 (1997).  Specifically, the AEDPA states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

28 U.S.C. § 2254(d).

Under (d)(1), a federal court may grant a writ of habeas corpus under two different clauses, both of which provide two bases for relief.  Under the "contrary to" clause, a federal court may grant habeas relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or, (2) if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts.  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  The words "contrary to" should be construed to mean "diametrically different, opposite in character or nature, or mutually opposed."  Id.

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts.  Williams, 529 U.S. at 407-08.

Relief is also available under this clause if the state-court decision either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. Id. at 407; Arnett v. Jackson, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable" and not simply erroneous or incorrect. Williams, 529 U.S. at 407; Lordi v. Ishee, 384 F.3d 189, 195 (6th Cir. 2004).

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Williams, 529 U.S. at 412. Further,

> "the phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."

Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting Williams, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state-court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002). Although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. See Dickens v. Jones, 203 F.Supp. 354, 359 (E.D. Mich. 2002).

**IV. Analysis**

*A. Double Jeopardy – Claim I*

The Fifth Amendment to the United States Constitution commands that no "person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The Double Jeopardy Clause provides three basic protections: "[It] protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717 (1969) (footnotes omitted). "These protections stem from the underlying premise that a defendant should not be twice tried or punished for the same offense." Shiro v. Farley, 510 U.S. 222, 229 (1994).

It is well established that the Double Jeopardy Clause does not prohibit a state from defining conduct to constitute two separate criminal offenses. Missouri v. Hunter, 459 U.S. 359, 368-69 (1983) (finding that when "a legislature specifically authorizes cumulative punishments under two statutes, . . . a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial"). In the case at hand, the Michigan courts have found that the legislature specifically intended cumulative punishment under both involuntary manslaughter and OUIL causing death. "The Legislature's intent was to permit the imposition of separate convictions and punishments for both involuntary manslaughter and OUIL causing death." People v. Kulpinski, 620 N.W.2d 537, 542 (Mich. App. 2000). The Court of Appeals further found that "the societal norm that the OUIL causing death statute seeks to address – intoxicated driving – is different from the societal norm addressed by the crime of involuntary manslaughter,

which conceivably encompasses a wide variety of behaviors constituting gross negligence and has no such intoxication requirement at all." Id. at 544.  Their determination is binding on the Court.  Banner v. Davis, 886 F. 2d 777, 780 (6th Cir. 1989) ("once a state court has determined that the state legislature intended cumulative punishments, a federal habeas court must defer to that determination").

Even under the stricter interpretation of double jeopardy Petitioner's claim would fail, as each of the two charges requires a proof distinct from the other.  See Blockburger v. United States, 284 U.S. 299, 304 (1932) (holding that "if the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not").  OUIL causing death under MICH. COMP. LAWS § 257.625(4) requires "a person, whether licensed or not, who operates a motor vehicle [on public roads while intoxicated] and by the operation of that motor vehicle causes the death of another person.  MICH. COMP. LAWS § 257.625(4).  Involuntary manslaughter under MICH. COMP. LAWS §750.321(c) requires an unlawful act committed with intent to injure or in a grossly negligent manner proximately causing death.  People v. Datema, 533 N.W.2d 272 (Mich. 1995).  Thus, conviction under OUIL causing death  requires proof of the defendant's operation of a motor vehicle, presence on public roads and intoxication; involuntary manslaughter requires proof of the defendant's intent to injure or gross negligence.  Each requires proof that the other does not, and therefore the conviction satisfies the Blockburger test.

Because the conviction of involuntary manslaughter and OUIL causing death does not violate the Double Jeopardy clause, this claim is meritless and is therefore denied.

*B. Knowing and Intelligent Waiver of Miranda – Claim II*

The Court now turns to the merits of Petitioner's <u>Miranda</u> claim.  Petitioner argues that he did not knowingly and intelligently waive his <u>Miranda</u> rights and that the statements that he gave to the police were therefore inadmissible at trial.

1. <u>Legal Standards Governing the Validity of Waivers</u>

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions against the accused.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 163-164 (1986).  Additionally, in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the United States Supreme Court held that the privilege against self-incrimination not only protects individuals from compulsion to testify in a criminal courtroom, but also from "informal compulsion exerted by law-enforcement officers during in-custody questioning."  <u>Id</u>. at 461.  A custodial interrogation means questioning initiated by the police after the person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  <u>Id</u>. at 444.  "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994).

To protect the right against self-incrimination of a person in custody, the Supreme Court determined that "prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 589 (1990).  Unless the suspect knowingly, voluntarily, and intelligently waives these rights, any incriminating responses to the questioning will be excluded.  <u>Id</u>.

<u>Miranda</u> rights may be waived only if the waiver is voluntary, knowing, and intelligent;

that is, the product of free choice rather than intimidation, and with full awareness of the nature

of the right being relinquished and the consequences.  Moran v. Burbine, 475 U.S. 412, 421

(1986); Machacek v. Hofbauer, 213 F.3d 947, 954 (6th Cir. 2000).  Such a waiver occurred is

determined under the totality of the circumstances.  Moran, 475 U.S. at 421;  Abela v. Martin,

380 F.3d 915, 928 (6th Cir. 2004).  In Moran, for example, the Court stated:

> The inquiry has two distinct dimensions.  First, the relinquishment
> of the right must have been voluntary in the sense that it was the product
> of a free and deliberate choice rather than intimidation, coercion, or
> deception.  Second, the waiver must have been made with a full awareness
> of both the nature of the right being abandoned and the consequences of
> the decision to abandon it.  Only if the "totality of the circumstances
> surrounding the interrogation" reveal both an uncoerced choice and the
> requisite level of comprehension may a court properly conclude that the
> *Miranda* rights have been waived.

Moran, 475 U.S. at 421.

Whether a suspect's waiver of Miranda rights is "a knowing and intelligent

relinquishment or abandonment of a known right or privilege" is "a matter which depends in

each case 'upon the particular facts and circumstances surrounding that case, including the

background, experience, and conduct of the accused.'"  Edwards v. Arizona, 451 U.S. 477, 482

(1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).  A court must examine the

"totality of the circumstances" to determine whether a suspect's waiver was knowing and

intelligent, including inquiries into the suspect's "age, experience, education, background, and

intelligence, and into whether he has the capacity to understand the warnings given him, the

nature of his Fifth Amendment rights, and the consequences of waiving those rights."  Fare v.

Michael C., 442 U.S. 707, 725 (1979).  "The Constitution does not require that a criminal

suspect know and understand every possible consequence of a waiver of the Fifth Amendment

privilege," but does require "that a suspect know [] that he may choose not to talk to law

enforcement officers, to talk only with counsel present, or to discontinue talking at any time."

Colorado v. Spring, 479 U.S. 564, 574 (1987); see also Moran, 475 U.S. at 421 ("[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it").

Additional factors to be considered by a court should include (1) police coercion; (2) length of interrogation; (3) location of interrogation; (4) continuity of interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of Miranda rights. Withrow v. Williams, 507 U.S. 680, 693-94 (1993). However, if the Miranda rights are properly given and invoked, the accused can still waive his rights. His responses to questions can be admitted at trial only on the finding that the accused: (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the rights he had invoked. Smith v. Illinois, 469 U.S. 91, 95 (1984). It is pivotal, however, to determine who initiates further discussion after Miranda rights are invoked. If the police initiate the discussion, such discussion is constitutionally prohibited even if it concerns an entirely different criminal investigation, and even where the defendant executes a waiver and his statements would be considered voluntary under traditionally standards. Minnick v. Mississippi, 498 U.S. 146, 151-54 (1990). This is so because the Fifth Amendment Miranda rights are non-offense-specific, and are designed to protect the defendant's right against self-incrimination during all police interrogations. McNeil v. Wisconsin, 501 U.S. 171, 177 (1991).

However, if the suspect is not in continuous custody, re-initiation of questioning by the police without the presence of counsel is not prohibited. Kyger v. Carlton, 146 F.3d 374, 380-81 (6th Cir. 1998). Also, if the suspect has only invoked his right to remain silent, and not his right to counsel, he may later be questioned about different crimes. Arizona v. Roberson, 486 U.S.

The question here is whether the totality of the circumstances showed that Petitioner knowingly and intelligently waived his <u>Miranda</u> rights before speaking to the police.

2. <u>Relevant Facts</u>

As explained by the Supreme Court, Petitioner's "age, experience, education, background, and intelligence" are relevant to the inquiry. <u>Michael C.</u>, 442 U.S. at 725. Petitioner was twenty-four years old at the time of the offense. He was a high school drop-out, who worked as a carpet installation mechanic. He lived with his girlfriend for about seven and one half years, in an apartment that they rented, until the incident in question. On the night of the accident, Petitioner learned that his girlfriend was having an affair. Petitioner was angered when he learned the information. He went to a party store and purchased a pint of Jack Daniels. Petitioner went to the house of a friend, and after sharing the bottle of Jack Daniels with his friend, Petitioner and the friend left to go to a party store, where they purchased another bottle of Jack Daniels. Petitioner had another glass before leaving his friend's house that night.

According to Petitioner's testimony, he recalled the roads being wet that night. He said that he remembered coming up too close to another car's rear bumper and, in order to avoid hitting the car, turned to avoid a collision. It is at that point that he lost control of the car and had no real memory of what happened afterward. Petitioner was taken to the hospital by ambulance. Witnesses, including an off-duty police officer, described Petitioner as being wobbly, and red-eyed. Testing at the scene indicated that he had been drinking.

Petitioner was still considered intoxicated when Detective Damiani conducted the interview in the hospital. Furthermore, Detective Damiani recorded the interview, but a large portion of the recording was accidently erased; the erased portion exceeded thirty seconds and

contained the actual waiver of Petitioner's rights.


3. Analysis

A Walker hearing was held to determine whether the statements in question could be used as evidence at trial. The trial court found that Petitioner's statements were "freely, intelligently and voluntarily made." (Trial Tr. Vol. II, p. 345.) The Michigan Court of Appeals agreed with the trial court. It stated, in pertinent part:

> First, defendant claims that the trial court erred in denying his motion to suppress statements that he made to a police detective in the hospital several hours after the accident. On appeal, defendant does not contend that the statements were involuntary. Rather, he claims that, due to his intoxication and hospitalization, he did not have the degree of understanding to make a knowing and intelligent waiver of his *Miranda* [footnote omitted] rights. We conclude that the trial court did not clearly err in ruling, following a *Walker* [footnote omitted] hearing, that defendant's statements were made freely, knowingly, and intelligently, with the understanding that they could be used against him. See *People v Daoud*, 462 Mich. 621, 629-630; 614 N.W.2d 152 (2000).

> Given defendant's concession that his statements were voluntary, the critical inquiry is whether defendant had the degree of understanding to provide a knowing and intelligent waiver of his *Miranda* rights. *People v Cheatham*, 453 Mich 1, 18 (Boyle J.), 44 (Weaver, J.); 551 N.W.2d 355 (1996). "To establish a valid waiver, the state must present evidence sufficient to demonstrate that the accused understood that he did not have to speak, that he had the right to the presence of counsel, and that the state could use what he said in a later trial against him." *Id.* at 29, citing *Moran v Burbine*, 475 U.S. 412, 423 (1986); accord *Daoud*, *supra* at 637. A suspect need not understand the ramifications and consequences of waiving his rights, and the test is not whether it was "wise or smart" to admit his culpability. *Id.* at 636; *Cheatham*, *supra* at 28-29. The accused need only know of his available options and make a rational decision, not necessarily the "best" one. *Id.* at 28.

> Defendant was advised, and by all indications understood, that he did not have to speak to the detective without an attorney being present. *Moran*, *supra*. As in *Cheatham*, it is undisputed that the police officer who questioned defendant administered *Miranda* warnings [footnote admitted], sought to insure that defendant understood the warnings, and obtained an express written waiver before questioning him. *Cheatham*, *supra* at 30. The written waiver is strong evidence that defendant's waiver of his rights was valid. *Id.* at 31. Defendant

also provided appropriate answers to questions that were intended to determine whether defendant was oriented to time and events. By his question to the detective of what he was being charged with, defendant also exhibited comprehension of what was occurring.

The record also indicates that defendant was advised of, and knew, that the police intended to use his statements against him. Moreover, defendant had two prior felony convictions. "A defendant's previous experience with the police is 'an important consideration in determining whether an inculpatory statement was made voluntarily and understandingly.'" *Cheatham*, *supra* at 35, quoting *State v Fincher*, 30 N.C .1, 20; 305 S.E.2d 685 (1983). Further, defendant was advised that other people were injured in the accident, that the detective was investigating the accident and would turn his report over to the prosecutor's officer for review, and that the prosecutor's office would be seeking a warrant against defendant.

Accordingly, the trial court did not clearly err in determining that defendant's statements to the detective were knowingly and intelligently made.

Kurilik, No. 219150, 2001 WL 1152904, slip op. at 1-2.

Under 28 U.S.C. § 2254(e)(1) of the AEDPA, the factual findings of the state courts are presumed correct unless rebutted by clear and convincing evidence. West v. Seabold, 73 F.3d 81, 83 (6th Cir. 1996). Thus, the Michigan Court of Appeals' decision in this case, that Petitioner's statements were made knowingly and intelligently, is presumed correct. However, the Michigan Court of Appeals incorrectly noted that Petitioner was not required to "understand the ramifications and consequences of waiving his rights." Kurilik, No. 219150, 2001 WL 1152904, slip op. at 1-2. Rather, Supreme Court precedent states "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran, 475 U.S. at 421. Furthermore, the state court of appeals failed to take into account that conducting an interview with Petitioner while he was both hospitalized and intoxicated were critical factors in determining whether he made a knowing and intelligent waiver of his Miranda rights.

In Colorado v. Spring, 479 U.S. 564 (1987), the United States Supreme Court held that

"although a determination of voluntariness under the Fourteenth Amendment forecloses a similar inquiry in the <u>Miranda</u> waiver context, we must conduct a separate review of whether [Petitioner] knowingly and intelligently waived his <u>Miranda</u> rights." <u>Id</u>. Michigan has followed that holding and requires a separate review of whether a waiver of <u>Miranda</u> was made knowingly and intelligently. <u>People v. Cheatham</u>, 551 N.W.2d 355 (1996) (citing <u>Derrick v. Peterson</u>, 924 F.2d 813 (9th Cir. 1990)). The Michigan Supreme Court has held that there must be a bifurcated inquiry. <u>Id</u>. The purpose of advising a defendant of his rights under <u>Miranda</u> is so that "he can make a rational decision, not necessarily the best one that would be reached only after long and painstaking deliberation." <u>Collins v. Brierly</u>, 492 F.2d 735, 738-39 (3d Cir. 1974). The Third Circuit in <u>Collins</u> further stated that, "it is not in the sense of shrewdness that <u>Miranda</u> speaks of 'intelligent' waiver but rather in the tenor that the individual must know of his available options before deciding what he thinks best suits his particular situation." <u>Id</u>.

Here, the Michigan Court of Appeals gave great weight to evidence tending to show that Petitioner did knowingly and intelligently waive his <u>Miranda</u> rights. However, there is no evidence that shows Petitioner had "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Moran</u>, 475 U.S. at 421.

The Michigan Court of Appeals gave great weight to the fact that Petitioner told the police officer that he understood each <u>Miranda</u> warning as it was read to him. However, the state appellate court failed to properly analyze the fact that Petitioner did not understand the consequences of his talking to the police because Petitioner was not capable of making a knowing and intelligent waiver.

Furthermore, being woken at 4:50 a.m., after a severe car accident in which Petitioner had to have sutures in his head and drugs to alleviate the pain, and where his blood alcohol level

was .16, were all critical factors that should have been taken into account in determining whether Petitioner made a knowing and intelligent waiver of his <u>Miranda</u> rights; at the time that Petitioner waived his <u>Miranda</u> rights, he was not fully advised of the consequences.

Petitioner does not contend that his confession was involuntary, nor does his testimony during trial indicate that it was coerced. Rather, Petitioner challenges his degree of understanding to provide a knowing and intelligent waiver of his <u>Miranda</u> rights. As previously stated, the facts that should have been considered are as follows: (1) Petitioner was awakened by Detective Damiani at 4:50 a.m.; (2) the interview took place while Petitioner was hospitalized and medicated; (3) just a few hours prior to the interrogation, Petitioner's blood tests revealed that he had a blood alcohol content of .16; (4) Petitioner was never told of the charges or the consequences that could result from being charged with certain crimes.

Hence, from that interrogation, a series of prejudicial statements were derived: (1) Petitioner told Detective Damiani that he had a drinking problem; (2) Petitioner also told him that he had been drinking whiskey for an hour prior to driving home; and (3) when asked how fast he was going, Petitioner told the detective, "fast enough to run that van up his butt if I didn't lock them brakes up. I don't know, 90." (Trial Tr. Vol. II, p. 385.)

Although the Petitioner testified on his own behalf and attempted to defend the statements admitted. Mostly likely Petitioner would not have testified had the statements not been admitted in error. On that basis, and for the reasons stated above, the Court finds that Petitioner was prejudiced by the admission of the statements.

The Court therefore finds that the state appellate court's adjudication of Petitioner's <u>Miranda</u> claim is contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

4. <u>Harmless Error</u>

The unconstitutional admission of a confession at trial is subject to harmless-error analysis. <u>Arizona v. Fulminante</u>, 499 U.S. 279, 309-12 (1991). As such, the Court "reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt." <u>Id</u>. at 310. It is here that Petitioner's <u>Miranda</u> claim fails. In light of the testimony of numerous eyewitnesses describing the facts of the accident and the state of the Petitioner, the statements made by Petitioner to Officer Walker at the scene of the accident, and the blood test showing an elevated blood-alcohol level, the Court concludes that admission of Petitioner's statements to Detective Damiani was the very definition of "harmless error." There is no way that the introduction of those statements, on their own, could have produced a different result in the case at hand.

Furthermore, Petitioner opened the trial by pleading guilty to OUIL causing injury, admitting that he had been operating the vehicle while intoxicated. This was the exact subject matter of his admission to Detective Damiani. In essence, Petitioner admitted the substance of the presently challenged confession on the first day of trial. The Court can therefore see no harm to the court's error in allowing the testimony from Detective Damiani, as it merely corroborated what Petitioner had already conceded.

Therefore, despite the admission of Petitioner's statement in violation of <u>Miranda</u>, the sheer weight of evidence supporting Petitioner's conviction renders the court's error harmless, and Petitioner's claim for relief on this issue fails.

### C. *Ineffective Assistance of Counsel, Trial and Appellate – Claims III and IV*

There are two elements to a successful ineffective assistance claim: 1) the attorney's performance must have been deficient, and 2) the deficient performance must have actually prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). To be "deficient" for constitutional purposes, an attorney's performance must have fallen below "an objective standard of reasonableness." Id. at 688. Courts should have a strong presumption that the challenged conduct was reasonable because the universe of reasonable representation is extremely vast. Id. at 689. It is up to the Petitioner to show that the attorney's conduct could not have been sound trial strategy, and to point out the specific instances of deficient conduct. Id. Even if Petitioner shows that his trial counsel's conduct was deficient, he must show that the deficiency actually prejudiced his case, meaning he must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

Similarly, with respect to appellate counsel, the prejudice prong is satisfied by showing "a reasonable probability that, but for his counsel's unreasonable failure... he would have prevailed on his appeal." Smith v. Robbins, 528 U.S. 259, 285 (2000). A court need not review the two prongs in any order; if deficiency is the easier issue to analyze, the court need not examine prejudice, while "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

### 1. Trial Counsel

Petitioner takes issue with the fact that his trial counsel conceded guilt on the lesser

included charge of involuntary manslaughter – effectively asking the jury to convict on that lesser charge instead of second degree murder – which Petitioner claims had the effect of conceding guilt on the OUIL causing death charge.  Petitioner further argues that the failure to request a jury instruction for negligent homicide (which is a lesser charge of both second degree murder and OUIL causing death) deprived Petitioner of a reasonable chance of acquittal and represented the ineffective assistance of counsel.

With respect to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. <u>Strickland</u>, 466 U.S. at 690.  The reviewing court's scrutiny of counsel's performance is highly deferential.  <u>Id</u>. at 689.  Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  <u>Id</u>. at 690. Having reviewed the record, the Court concludes that Petitioner has not established that trial counsel was deficient.  Trial counsel reasonably determined that Petitioner's defense would be best served by not challenging the charge that was supported by the vast majority of the evidence, and that conceding guilt on that claim created a better chance that Petitioner would not be convicted of the greater crime of second degree murder.  Petitioner has not rebutted the presumption that counsel's conduct in this regard was sound trial strategy.  The fact that counsel's strategy was unsuccessful as to the OUIL causing death charge does not mean that counsel was ineffective.  <u>See</u> <u>Moss v. Hofbauer</u>, 286 F.3d 851, 859 (6th Cir. 2002) ("an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken").  Similarly, the failure to request a jury instruction of negligent homicide was not outside the range of professionally accepted assistance, as it would have conflicted with counsel's attempt (ultimately successful) to secure

the lesser charge of involuntary manslaughter and spare Petitioner the conviction of second degree murder.

To satisfy the prejudice prong under <u>Strickland</u>, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id</u>. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. <u>Id</u>. "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." <u>McQueen v. Scroggy</u>, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting <u>Strickland</u>, 466 U.S. at 686). Here, the Court concludes that Petitioner has not established that he was prejudiced by counsel's performance. Petitioner argues that counsel's actions prevented either an acquittal on the OUIL causing death charge or a conviction on the lesser charge of negligent homicide. The great weight of evidence – Petitioner's admissions at the scene, eyewitness testimony, blood test results and other physical evidence – would not have supported an acquittal under either charge. Nor is there a reasonable probability, given the voluminous evidence against Petitioner, that a conviction of negligent homicide would have been likely if counsel had requested the instruction. Thus, even if Petitioner were to establish a deficient performance, which he does not, he would still fail to establish the necessary prejudice to claim ineffective assistance of counsel.

Petitioner has thus failed to establish that counsel was deficient or that he was prejudiced by counsel's performance so as to warrant habeas relief. In short, Petitioner has not shown that his counsel's inactivity fell below constitutional standards, and this claim is denied.

2.  <u>Appellate Counsel</u>

The same standard applies to Petitioner's claims as to the adequacy of his appellate counsel.  <u>See</u> <u>Bowen v. Foltz</u>, 763 F.2d 191, 195 (6th Cir. 1985).  The bulk of Petitioner's claims, however, merely reiterate the alleged failures of his trial counsel.  Petitioner's only substantive charge against his appellate counsel is an accusation that his counsel demanded more pay in exchange for a better performance.  Petitioner alleges that his appellate counsel told him in a letter that her "performance was dictated by her pocketbook," and suggests that counsel meant she would try harder or perform better if paid.  However, Petitioner fails to produce the letter or any other evidence supporting this inflammatory accusation.  Thus, in failing to provide evidence of an unreasonable failure of the appellate counsel, Petitioner fails to meet the <u>Strickland</u> standard, and his claim of ineffective assistance of appellate counsel is therefore denied.


### D.  *Abuse of Discretion – Claim V*

Finally, the petitioner asserts that he is entitled to habeas relief because the trial court abused its discretion in denying Petitioner's motion for a directed verdict. Essentially, this claim challenges the sufficiency of the evidence to support that conviction.  Under Michigan law, a directed verdict of acquittal is appropriate only if, considering all the evidence in the light most favorable to the prosecution, no rational trier of fact could find that the essential elements of the crime charged were proved beyond a reasonable doubt.  <u>People v. Wolfe</u>, 489 N.W.2d 748 (Mich. 1992), <u>People v. Pena</u>, 569 N.W.2d 871 (Mich. 1997).  Circumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of a crime. Questions regarding the credibility of witnesses are left to the trier of fact.  <u>Id</u>.

Viewed in a light most favorable to the prosecution, there was sufficient evidence to enable a rationale trier of fact to find the necessary elements beyond a reasonable doubt. The court heard testimony that Petitioner struck the car carrying the deceased and caused her death, that Petitioner was speeding and driving in an unsafe matter, that liquor was found in and around his van, that Petitioner was slurring his speech and otherwise acting inebriated, that Petitioner admitted he had been drinking, and that Petitioner's blood-alcohol level was well above the legal limit. Accepting this testimony as true, the trial court did not err in denying defendant's motion for a directed verdict. Petitioner's final claim is therefore denied.

## V.  Conclusion

**IT IS HEREBY ORDERED** that Petitioner's Application for Writ of Habeas Corpus is denied.

s/Marianne O. Battani

MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

DATED: May 19, 2008

## CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.

S/Bernadette M. Thebolt

DEPUTY CLERK